Nagle v. Morris, and for the appellant we have Ruth Wyman for the appellate, Brett Olmstead, and Ms. Wyman, you may proceed. May it please the court and counsel, I'd like to reserve five minutes on rebuttal. You've got it. This is a custody case, but a bit different, I think, than some of the cases that the court may normally hear. The trial court in this case made errors and did not abuse its discretion in awarding custody to the respondent mother. This really comes down to whether a parent who has exerted primary control over a child, and so kept that control of that child for several years away from the other parent, should be rewarded with an award of custody. This is a parent, we're talking about a parent, the mother in this case, who has, prior to a petition for custody being filed by my client, the petitioner, Robbie Nagle, had no problem with my client taking care of the child, spending time with the child, keeping the child overnight, bathing the child, taking the child to school, to daycare, medical appointments, and that sort of thing. But the minute he files, or starts to make noise that he's going to file a petition for custody, she threatens and follows through with those threats to cancel medical appointments for the child that he has made. She executes documents for school without any reference, not only to the father's address, but that there even is a father at all involved in the picture, despite the fact that she knows, and she knows very well where he lives, because they've exchanged the parenting information, exchanged the child. And he had filed for and been granted an emergency order of protection against her for her violence against him in front of the child just a few months earlier. But when she files the registration for the child's school at Urbana School District 116, and this is pointing specifically to A30 in the appendix, Respondents Exhibit 6, she makes no reference that there is even a father involved. This is on April 8, 2014, several months after the petition for custody had been filed, and two months after the petition for an emergency order of protection had been filed and granted. She claims she just didn't have her phone with her, and that's why she didn't know his phone number. Why didn't she even put in his name as any reference that there even is a father involved in the picture or acknowledged? No reason. In the Respondent's appellate brief, she claims that she didn't even know his contact information, but I believe that's clearly rebutted in the reply brief that makes reference to the numerous documents that Shea, the Respondent mother, and FLE had in her possession at that time. This is simply one of many examples of efforts, successful efforts, by the Respondent mother to keep the father away from the child, except when it was in the mother's interest to do so. When the mother wanted to go to yoga instead of taking the child to a medical appointment or to a therapy appointment, and she remembered to tell the father, the father could take the child to the appointments. Otherwise, it was just one time a week that the father could take the child to the medical appointments. This was after the custody, after the agreed order, which didn't designate custody, but designated parenting time had been entered. The mother admitted, and it's been part of the record, that after Robbie Nagle filed for custody of the minor child, Harper, she refused to allow him any additional time other than what was specifically allowed for in this parenting schedule. It sort of brings into the question, how did a parenting schedule even get entered? Well, the parties had been sharing parenting time with the child, generally for the child's life of four years or so. When Robbie became concerned about parenting issues, decided to file for custody, this was then that angered Shea so much so that she committed violence against him in front of the child. This is documented in the Petition for Emergency Order of Protection, which is part of the supplemental record that the court allowed in. On February 12, 2014, Robert Nagle filed a verified petition for order of protection. That emergency order was granted by the trial court. What's important to note, because the trial court unfairly criticized my client for filing a petition for order of protection, despite the fact that it was granted, claiming and suggesting in the line of Gordon that this was an abuse of the court system, because what happens in many cases, I'm sure the court's aware, is that you have, in a custody case, one parent will file a petition for an order of protection claiming violence to try and get a custody advantage. That actually wasn't the case in this situation. Not only was the emergency order of protection granted, but in the request, again, part of the court's supplemental appendix, my client doesn't ask for sole custody of the child. He states in there specifically that it is a shared responsibility at the question that the primary caretaker of the minor children, where it asks petitioner or respondent, he says other, shared responsibility. When it asks for what the, are there any other cases going on, he states, there's the custody petition that's already been filed and is already on file. And when it asks for visitation or control of the child, he doesn't say just give the child to me, don't let the mom have it. No. He repeats a schedule. Respondent, the mother should have the child Wednesday through Thursday from 4 p.m. to 10 p.m. Every other weekend from Friday to Monday, Friday 3 p.m. to Monday 10 a.m. Undoubtedly similar to what the parties were already exercising in that parenting schedule. So since you're talking about the order of protection, I have a question about that. Yes. It appears from the record that it was represented to the trial court that Judge Clemmons did give possession of the child to your client. That's what the parties represented to the judge, to Judge Blockman. And I note that, and I believe it's the transcript of the day that the emergency order is granted, Judge Clemmons specifically says, I'm not going to enter any order with respect to the child. But it appeared to me that everyone was under the assumption that an order had been entered giving your client possession of the child. And that representation was made to Judge Blockman. So I think you're right as far as all of those representations. I was not an attorney. Neither of us here today were attorneys for the parties at that time during that order of protection proceeding. The emergency order of protection granted by Judge Clemmons is different from the Judge Blockman who heard the custody proceedings. In granting that order of protection did not, or what the court did, and there's a lot of scratched out there. That's what I was going to say. It's very difficult to read. But in the transcript, Judge Clemmons specifically says, I'm not going to enter an order with respect to the child. Right. You're right, and I do recall that. But in this order where she says, it appears when she marks out various parts of the schedule, she grants the respondent mother Friday 3 p.m. to Monday 10 a.m. There's not even that reference that my client had suggested. Mother should also have this additional time on, I think, Wednesday through Thursday. And it talks about visitation, which implies a custody to the other parent. But you're right in that, though the representation was made, the order only was as to Robert Nagel, not as to the minor child. Though the petition had requested it. And I believe that my client had stated that. I think that was in error. It clearly was in error. That he had stated it. The problem was, and what the court may recall from the testimony, was that Robert Nagel then dropped the petition for order of protection, had it voluntarily dismissed. And when asked on the stand, why did you do that? He said, because I hadn't gotten to see my child in three weeks. So the only way he could actually see his child and spend time with his daughter was if he agreed to dismiss his petition for order of protection. He couldn't even see her on the time. And I think it was this misunderstanding in the order, since the order said mom gets to have the child from Friday to Monday, that it was implied, or he understood it, and perhaps from his prior counsel, that he was to have the custody, when I think there was no, you can't have a custody order in an order of protection. You can have, because the case law is very clear, you can have physical possession, but you can't have custody. But so that's perhaps where the confusion is and was, even on behalf of both of the parties. There's a recent case law in remarriage of Rogers that I cited in the reply brief that talks about the, it was a little different case, although it was a custody parentage case, and it was in a motion to reconsider, but the issue and concern was about the, in that case the mother had put the child into harm's way. Luckily the child had not been injured. In many circumstances in this case, Shay Morris has put the child in harm's way. There's a time when the child, December of 2012, mom decided she wanted to go to Hawaii with a guy she had met once at some yoga retreat in North Carolina, and decided to take the child, two and a half year old disabled child, who can't walk on her own at two and a half, left her with a guy, Tommy Campbell, who she referred to as Tommy, someone else in the proceedings. She didn't remember really what his name was, but left him there while she went scuba diving and other really cool things that one would do in Hawaii. This is someone who the child had never met, who mom had met once, but this 60-year-old guy had invited this 20-year-old woman to come out to Hawaii, and she wanted to take that opportunity. Another time, her landlord invites her to go to a nudist colony, and so mom takes child to a nudist colony with the landlord, and apparently a couple other renters also went there. Mother later clarified that in the areas where they were eating, they did have clothing, but in the other areas she referred and responded and answered it was a nudist colony. Another time, mom takes the child to Arizona to spend time with some other guy that she's met. In each of these circumstances, luckily nothing has happened, but mom does not suggest that there's any remorse or concern about where she's leaving this child when she goes off on these wonderful vacations that she's invited to by 60-year-old men to just go on vacation with her. She just leaves the child with other babysitters, which is also of concern what she's doing when she leaves the child at home. In a home in a rooming house where she has lived and lived all of the child's life, where the child has her own separate bedroom, mom has her separate bedroom, and then there's a shared living space with two other renters. Who are these other renters? They switch from semester to semester. What's their history? Do they have a criminal history or a criminal background? She doesn't know. She doesn't even know their last names. But the child is staying, and until the middle of these court proceedings, was sleeping in and staying in an unlocked bedroom in a rooming boarding house where one doesn't even know, and mom apparently hasn't even cared to check, what is the history or potential for any of these other boarding rooms. But the trial court said, well, there's a stability there. I suppose there's a stability. You'd have a stability in some other places, but the alternative is to this risk of leaving a child in a boarding house or a rooming house where there's no locks on the door until finally we complain enough in the courthouse that she puts that lock on the door. We have a single family residence backyard where the child can do gardening and does do gardening, plays with the family dog, and where the they make accommodations on the steps and on the handles for the doors so that the child can learn, because of the severe disabilities that she has, to learn these independence, to learn how to turn on and turn off the water. Who is Mr. Malady? Malady. Malady. I'm glad you asked. Yes, he is another family law attorney, like me, and like the other counsel that she had in this family law case. What the court does, and I don't know how familiar the Fourth District is with this, Judge Wachman has set up a procedure, a protocol, when there is a custody dispute, to appoint another family law attorney. He calls them a limited guardian ad litem, very distinct from a guardian ad litem that's provided for under statute. That limited guardian ad litem is paid $700, $350 by each side, and then reviews any documents the attorneys provide to that limited guardian ad litem and interviews, in this case, each of the parties. Sometimes they interview the child, but in this case that wasn't done. There is, and Mr. Malady was appointed prior to me becoming counsel for Mr. Nagel, but it's a very limited, as the name would suggest, procedure, that report is done prior to any custody procedure, any, actually, decision to go to custody, to a custody trial takes place. So, in his report, I think Mr. Malady states that he interviewed the parties, and I think he reviewed a few of the pleadings, the petition for custody, the response, and that's it. There wasn't any of the evidence, all of the documents that you would see in the, well, he didn't review any of the transcripts, because, of course, none of the proceedings had occurred, so he didn't hear any of that evidence. Wouldn't have reviewed any of the documents in the separate appendix of the petitioner or the additions by the appellee. I guess that was just the court's ruling, or the transcript of the court's ruling. None of those documents. So, it's very limited, and it is, and there is no special training that a family law attorney has. I've been a guardian ad litem in other cases. It's just a way to try and bring the parties together and say, you know, can't you work this out without going to trial. So, it's quite distinct from guardian ad litem. You say that you've served as guardian ad litem. Yes. Speaking of the limited guardian ad litem role that Judge Blockman has assigned you, and have you testified in court in cases? I have not testified in court. It is not common, though it sometimes occurs for a limited guardian ad litem to testify in court. Normally, the attorneys have to, the parties have to pay extra to bring that limited guardian ad litem to testify, but the procedure is you do the interviews. If custody is still at issue, Judge Blockman will say, okay, in 30 days, you've got to file, a limited guardian ad litem has to file their report. And so that's the report that you see referenced in the transcripts and in the record is that limited guardian ad litem report. And what I'm, I'm sorry, what I was going to ask you is, specifically in this case, is there something in particular that you take issue with in terms of Mr. Malady's testimony? Either evidence that you know he was unaware of, you indicated that he did sit through testimony, but do you know that he was unaware of certain evidence that he should have been aware of prior to making recommendations, or are you saying that his testimony should not have been admitted? Specifically as to Mr. Malady's role in this case, what is your decision? Sure. There's a couple different positions. One is, so he did not testify, but his report is considered by the court and referenced in its ruling. I don't think that's appropriate as a, it's a hearsay document because he is, because he's not the court's witness as far as a guardian ad litem who's gone through all of the training or a 604B evaluator which is a court's witness. Was there an objection tendered to the report? There was no objection tendered to the report. The other, the main issue with the limited guardian ad litem is he didn't hear any of the evidence. There's nothing in his report that suggests that he heard about and knew about Shea Morris taking Harper and leaving her with this guy, this six-year-old man, Tommy Campbell, in Hawaii and his friends, who we don't know anything about, while she went off and scuba dove and kayaked and the other things you do, I guess, when you go to Hawaii. No testimony about that. Nothing that suggests he heard or received any information about how Shea had gone to the nudist colony and taken Harper. I think at the time maybe one-and-a-half-year-old child, maybe she was three at the time, to the nudist colony with her landlord. No testimony about how she, how the door, how Shea had, in the rooming house, left the child in her own bedroom, the door, without a lock on that door. And no testimony about the various documents that Shea would, would fill out with the school district that leave any reference to Robbie Nagle being a father, let alone his contact information. Counsel, did you, or counsel below at the trial court level, did they have access to the report prior to the evidentiary hearing? Yes. And was there any effort made to call the limited guardian ad litem as a witness? No, there was not. I see that the light is up, so I'm going to reserve that additional time. You have until the red light. Oh, thank you. Okay. The, the other, so you have the issues of leaving this child with very random, I always call them random men or in dangerous situations. The nudist colony, perhaps, obviously Shea didn't see that as a dangerous situation. She said she might, you know, she'd take the child to the nudist colony again. Taking, leaving the child in Hawaii and with another man in, in Arizona. And then you have the issues with leaving the child just at home or, or without any concern about a lot, having a lock on the door. And again, this is with a disabled child, someone who doesn't have the ability to walk or to run away when there is danger. And so that brings heightened concern. Where you have on the opposite side a father who has been fully involved, as involved as the mother will allow him to be. When he's made appointments, she's canceled those appointments. And then forgotten to take the child to that physical nursery for the kindergarten appointment. Forgotten to take the child to the dentist appointment. So you have, you know, have to wait another three months before the child can get into the dentist because mom just forgot about it. And then other times where mom just didn't take the child to her various appointments, physical therapy, because her hair was wet and she had just woken up. Or she texted that and that's part of the appendix. Or where her, the, what else had happened? She just overslept, felt like going to yoga, not taking the child. That may be having control of the child. But that's not in the best interest. And looking to the future is not in the best interest of the child's life. Thank you. Thank you, Counsel. You will have rebuttal if you choose to utilize it. And now, Mr. Olmstead. May it please the Court. Counsel. What you've been offered is an analysis that is completely wrong for a child custody determination, not only in the trial court, but especially for the review of that kind of determination. What Mr. Nagle is asking is for a new court to take a fresh look at the evidence, make its own findings, and determine its own weight for the different evidence pieces and factors to be given and render a decision that he thinks was best for this situation. His argument is not that the trial court didn't accept evidence properly or accepted evidence that shouldn't have been accepted or considered factors that were unrelated or irrelevant. His position is that the trial court weighed the factors wrong. And where he runs into a brick wall is with the standard of review. The standard of review in this case is extremely deferential. Child custody determinations are a totality of circumstances ruling that is entitled to great deference. Only an abuse of discretion, a decision beyond reason, could be overturned by this court. And that's not what you have here. Mr. Nagle was entitled to a trial court that received the evidence properly, that considered that evidence, that considered the statutory factors, weighed and balanced those factors, and issued a decision. And that is exactly what Judge Blockman did here. Skipping ahead a little bit just to answer questions, the emergency order of protection was an ex parte proceeding that accomplished through force majeure the reversal of the custodial situation. That's what Mr. Nagle was intending to do and that's what the order would state. But in Judge Clemmons, when she talks about what she's doing and what she's not doing, talks about excluding the child, what she's referring to is as a protected party. The child was excluded as a protected party in the order of protection. And I'll get to that more later, but I wanted to answer the question up front. Judge Blockman identified the correct statutory factors, went through them in detail, applied factual findings to those factors, and rendered a decision. And the statute that sets out those factors, Section 602, does not require that any particular factor be given any particular weight. It does not require that certain factors be given more weight than others. A trial court can assign more weight to a factor than another factor and is free to do so within its discretion. That's not the analysis that Mr. Nagle wants to proceed with. Mr. Nagle wants to proceed with a bits and pieces approach to pick out what he thinks is most favorable to him, collect it in a little pile, and point to it, ignoring everything else. That's not what Judge Blockman was supposed to do. And in fact, if he had done that, that would have been an abuse of discretion for this court to look at. Judge Blockman weighed the statutory factors. Number one, Ms. Morris has been Harper's primary caregiver her entire life. That fits in with Section 602A3 and A4, the interaction and interrelationship of the child with his parent or parents, the child's adjustment to home, school, and community. From the time of Harper's birth, she has resided primarily with Ms. Morris. Counsel, there was a period of time where Dad moved away to teach. And then immediately following the child's birth, there was a time when Dad was not involved, maybe a six-month period, or she lived with her mom. She lived with her mom in Morton for six months while Harper was receiving treatment at Chicago Shriners. Right, that's correct. And there was a period of, I think it was about a year and a half, where he had moved to Crystal Lake. Ms. Morris and Mr. Nagel have never lived together, and Harper's never been with Mr. Nagel for longer than one week. And when you say that Ms. Morris has been Harper's primary caregiver in this situation, that means something different. Caregiver in the context of Harper is something much more intense than what you would expect for an average child. She suffers from a physical disability that is severe. Ms. Morris has handled and managed that disability from day one all the way up through today. She has done an exemplary job. She has identified doctors and specialists. She's provided the care. She's modified her home for Harper. She has managed this situation with great ability and great care and great love. She's devoted herself to Harper. That means daily hard work from wake to sleep every day. That's been going on for all five-plus years of Harper's life. Mr. Nagel's answer to this is to argue that Ms. Morris has been less than perfect, but his criticisms don't establish an abuse of discretion, and they tend to fall flat. For instance, Ms. Morris missed 15 to 20 out of 80 therapy appointments in a single dentist appointment. But Mr. Nagel himself, for 20 appointments at Chicago Shriners in 2010, he went to two to three. Ms. Morris stayed with Mr. Nagel's family. He did not. Twelve appointments in Chicago in 2013 to 2014, he went to two. Fifteen appointments in St. Louis for treatment with a shoe and bar, he went to two. Thirty-seven visits to Philadelphia for 118 treatment appointments, he went to five. He went to 24 of the appointments. This isn't to say something negative about Mr. Nagel. The truth is Mr. Nagel is a good father. He is a fit and able parent because the truth is this is a child custody determination involving two fit and able parents. But the fact is that Ms. Morris has been primarily responsible for caring for Harker. Ms. Morris testified. She did miss appointments. She testified to missed appointments because she was in Chicago to take Harker for a treatment for a broken arm, weather, sickness, scheduling conflicts, a yoga fitness class for her back. And, in fact, the issue of missed appointments was thoroughly debunked by the cross-examination of Mr. Nagel in Volume 10 of the transcript at pages 64 to 67. It's a litany of questions like this. Do you know that Shea was on vacation with Harker for this missed therapy appointment? Answer, yes. Or did you know she was out of town then? Answer, I was not aware of that. Or this is a good one. You didn't know that she was in California for a doctor's appointment? Answer, now that you say it, yes. Or are you aware that the appointments were canceled by the therapist? Answer, possibly. The whole thing fell apart on cross-examination. It didn't show a neglectful parent. It shows that life happens and issues arise. The wet hair incident. This is a perfect example of how empty the criticism of missing appointments is. Mr. Nagel testified that there was one appointment that Ms. Morris missed because she'd woken up for a nap with wet hair. The fact is, Mr. Nagel himself had already planned on taking Harker to that appointment anyway. Harker didn't miss an appointment because of that. It was a question of whether Ms. Morris attended or not. Not whether Harker attended or not. It was a complete non-issue that's been blown up in this hyperbole of brief writing. Leading to this description that Ms. Morris does nothing but go to yoga and skip appointments and gallivant around the country with older men. That also falls apart with the cross-examination of Mr. Nagel. This time, Volume 10 of the transcript at pages 73 to 76, and with the direct examination of Ms. Morris. Because in her role as primary caregiver, it was Ms. Morris who researched Harker's condition thoroughly and keeps herself apprised of recent research, found the doctors who were experts in treating her condition, and in fact, chose all of the doctors. Set up the appointments with Dr. Van Boss, a specialist. Suggested kinesio tape to facilitate movement in Harker's shoulder and toes. Suggested electrical stimulation. Suggested using tape to build up Harker's muscle and drove her to Bloomington Easter Seals to have those treatments. Had a derotational strap made to bring Harker's internally rotated right leg back so she could walk better. Suggested a DEXA scan to measure her bone density. Suggested to the Philadelphia doctor a drug to increase bone density and possibly reduce fractures. I'm forgetting the dynamic K flow. Who knows what else? Shea Morris has acted not just as a parent, a limo driver. She is an advocate for Harker and has been from the beginning with her medical providers. She's been doing exactly what you would want the mother of a child with this condition to do. The trial court didn't abuse its discretion in finding that she was the primary caregiver for Harker. There were some factors that were not at play. 602A1 and A2. Both parents certainly loved Harker and wished to have custody. Harker was too young to give a meaningful expression of her wishes. Harker's interaction and interrelationship with significant others was better with Mr. Nagel's family. This is a demonstration of the even-handed analysis that you see in this case from Judge Blackman. This isn't I'm fixated on one party so I'm going to say everything positive about this party and ignore everything else. This was a judge who took careful notice of the facts making his findings and carefully applied the statutory factor to those facts. He found that the factor favored Mr. Nagel and that was supported in the record. Mr. Nagel's family and significant other Natalie were shown to be positive influences in Harker's life. Ms. Morris' relationship with her family was not as close. Although there were others in her life that were positive influences for Harker. Alfred and Marietta Hubler, Jonah and Kate Weisskopf. But overall this factor favored Mr. Nagel, certainly it did. But the statute again does not require that any one factor be given more weight than any other. Mr. Nagel argues that this factor is paramount and then begins a mudslinging campaign that just falls flat. Vacations and older men. His name is Tommy Henderson, it's not Tommy Campbell. It was cleared up later in the record. Going to Hawaii, going to Nevada or New Mexico. She met these people, she knew these people, she hadn't known them her whole life. Mr. Henderson may have watched Harker for 30 minutes at a time, maybe three times a week. This was absolutely meaningless to the trial court's determination. There was no demonstration or evidence that any of this was a risk to Harker. None at all. There's Ms. Morris' mother. There was a single incident in her home involving Ms. Morris' sister, and that's it. But it's interesting to note in the record and the testimony that Mr. Nagel still didn't like it. He still didn't like Harker going to Morton to stay with Ms. Morris' mother. Not because her mother was incompetent or a risk, but because she was so far away. So far away from who?  It's as if Harker needs a parent watching over her 24 hours a day, seven days a week. It didn't make any sense. It didn't establish anything. It didn't establish an abuse of discretion. Then there's Ms. Morris' brother. This is one gigantic red herring that means absolutely nothing in this case. The evidence about it isn't evidence at all. It's something attached to a motion that was filed after all the hearings were done and the custody determination and the court had taken that under advisement. And so in the last hearing, Volume 15, where Judge Blockman is going to announce his ruling, he mentions that this motion has been filed and maybe it should be set for hearing. Maybe we ought to do something about it. Well, that's all it was. And documents attached involving some unrelated federal case that involves a person that's Ms. Morris' brother. It wasn't linked to Harper or Ms. Morris' caring for Harper or anything else. It was completely improper for Judge Blockman. If Judge Blockman had suddenly changed his ruling and gone on for pages about this filing that had just been made, what would we think of that? It didn't mean anything to this case. Next factor, 602A4. Harper's well-adjusted to home, school, and community in Ms. Morris' care, but a comparison of present accommodations and situation favors Mr. Nagel. Here's another example of very even-handed review of the facts and application of the law. The fact is, other than for six months with her mother in Morton when Harper was getting treatment at Chicago Shriners, she has lived with Harper in the same place all of Harper's life, 308 West California in her banner. She's happy there. Her room's specifically designed to accommodate her, furniture, play area, activity stations, even a special electronic toilet. All the toys are geared to her and her disability. It's her home and it's been her home since she was born except for those six months in Morton. Mr. Nagel's had multiple residences. Again, this isn't saying anything bad. He's not a bad father, but this is the fact. He's had multiple residences, one with Mr. Hubler, who he now complains vehemently about. He was Crystal Lake for a year. He was in an apartment for a year, moved to another apartment. Now he lives, this is since April or May of last year, on Walnut Street in Urbana, a single family residence. And it's very nice and it's very well appointed for Harper. He moved there from 311 West Elm where he lived for one and a half years. Now that was a similar living arrangement to what Ms. Morris and Harper have at 308 California. There was a house with multiple rooms with people who moved in and out semester-wise. Unlocked door, no gate, staircase that could be dangerous. Now before his current address on Walnut, had Mr. Nagel ever had a bedroom, separate bedroom for Harper? There was a time when Mr. Nagel met Ms. Morris' roommates. That was up until the semester before temporary custody hearings started. He never expressed any concerns about Mr. Hubler, his wife or daughter, or Harper living in the house until the custody proceedings started. That was a contested issue. That was Ms. Morris' testimony. Mr. Nagel said that he had complained. But of course here we sit, with the standard of review that requires that all the evidence be viewed in the light most favorable to the appellee. But now, in the reply brief, we're talking about rape. We're talking about abuse. How does something progress from, you're living with roommates and I'm living with roommates, you're living with roommates and I meet and interact with them, you're living with roommates and I express no concern, to you're living with roommates and recklessly putting my child at risk for rape and abuse. This is hyperbole that's intended to argue that this factor should be elevated above all others. The statute doesn't require that. The facts supported Judge Blockman's decision. The party's mental and physical health, 602A5, were equal in both positives and negatives. Neither party had significant mental or physical health issues. The negative had to do with animosity toward each other. Plenty of that. Mr. Nagel's arguments about depression and counseling years ago amounted to absolutely nothing. No diagnosis, pure speculation. An issue was made about Harper's broken arms. It was clearly established in the evidence that that is a common thing for people with this condition. He wanted to use elbow pads, not required by any doctor, but he liked that. Ms. Morris didn't like that because she felt it separated her out, made her seem different. None of that established anything that would come close to an abuse of discretion by Judge Blockman. Physical violence or threat of physical violence was not a substantial problem in this case, 602A6. The trial court considered this a draw, noted that there was yelling, and it was mutual. The problem with Mr. Nagel's argument on this point is that the facts are disputed. And the facts at this point have to be viewed in the light most favorable to Ms. Morris. Mr. Nagel has testified that Ms. Morris struck him in the face. That then generates the emergency order of protection, according to his testimony. But Ms. Morris testified that that never happened. And actually what happened is he grabbed her arms while she was standing outside the car with Harper inside the car and pushed her away from the car. Ms. Old testified that Ms. Morris yelled at Mr. Nagel on three occasions in Harper's presence. Harper became upset. The problem with that argument is, again, that it's factually disputed. Ms. Morris testified it never happened. There were arguments, but she wasn't yelling. And Harper either was not present or was not upset or offended. The fact certainly is that there's animosity between these two parties, and it manifested through arguments. And I'm sure voices were raised. And certainly Judge Bachman felt that voices were raised. But physical violence, this is not a case of physical violence. Mr. Nagel was less willing and able to facilitate and encourage a close and continuing relationship between the other parent and the child, 602A8. Mr. Nagel's argument runs into two problems regarding this factor one. Ms. Morris had a proven record of facilitating a relationship when she was primary caregiver, and his adversarial position was inconsistent with fostering a close relationship. Until the end of 2013, so for the first four-plus years of Harper's life, it's not since the family case was filed, as was stated in an argument a minute ago, filed in 2012. It's not until 2014 that things start falling to pieces with the emergency order protection force majeure, calling the police to reporting trespassing, refusing to let Ms. Morris take Harper to the hospital and treat her broken arm. After that, it was sticking to the schedule with little flexibility, not therapy limited to once a week. She never interfered with his ability to attend therapy appointments. It was attending without her. That's what happened. Ms. Morris reacted poorly to what she perceived as an attempt to substitute Mr. Nagel for her, not to play a role in Harper's life, to substitute for her. The emergency OP was most notable in feeding that belief, and it was an end run around the statute. It was a misuse of the order protection statute. The videotaping specifically noted. That brings me to the second point in this factor, the adversarial position. How can you say that Shea places Harper in questionable situations where she could be raped or abused, cares only about herself and her yoga appointments, not about Harper, misses sessions because of wet hair, violent, mentally unstable? All of this is present in the record, in the briefing. Reckless parenting, neglectful parenting, but he's going to facilitate full participation in the relationship with that parent. Baloney! That doesn't make any sense. The fact is, both parties have shown immaturity here in dealing with each other. Both of them. Mr. Nagel needs to stop thinking that Ms. Morris is some kind of monster. Ms. Morris needs to stop thinking that Mr. Nagel wants to terminate her motherhood. That's the way she acts, and that's the way he acts, and none of that is true. They both need to grow up. But overall, Ms. Morris has done a better job facilitating a relationship. I note that my time has run out. Okay, counsel, thank you very much. Is there any rebuttal? Yes, please. Okay. Ms. Wyman, before you begin your rebuttal, could you just clarify for the record, is your client suggesting on appeal that Mr. Nagel, excuse me, Ms. Morris, is somehow responsible for the arm fractures? The evidence isn't clear that she's responsible for the arm fractures. What the evidence shows is that I think of the five times in the child's five years where her arm was broken, it was, I think except for one time when it occurred at school, it was always when the child was in mother's care, and always at a time when the child was not wearing elbow pads, which father had provided repeatedly to mother, but mother had refused and said the child didn't need. Well, let me ask the question more pointedly. Sure. Is your client critical of Ms. Morris relative to her care of the child in terms of the arm fractures? Yes, he's critical. He is critical of that and concerned about that, especially after the repeated arm fractures and the refusal to put arm pads on. Counsel is correct that there is no doctor directive saying the child should always have arm pads on or elbow pads, which is what Robbie Nagel had provided repeatedly to Shea, and that Shea had said, mother had said, I think in various times she had lost them, so he would provide those again, and then she continued to not put those on the child, so there was sometimes the answer of she had lost them, other times just the answer that she didn't agree, and it's true the doctor didn't require those elbow pads. Well, is there any evidence that these arm fractures would have been avoided if she had been wearing elbow pads? There is no evidence that they would have been avoided. It's, I think, notable that during this entire time, during the custody proceedings and prior, that the child did not break her arm. Her arm was never broken in father's care, and father had the child wearing elbow pads. But if you're looking for something that says doctor said, mom, if only the child would have been wearing elbow pads, the arms wouldn't have been broken, there isn't any of that evidence. I'm not trying to claim that there is. Does that answer the court's question? In a way. I just simply wanted to know whether or not the mom is suggesting, or excuse me, dad's suggesting mom is responsible for the broken arms. Not in so much of a pointed way, I think, where it's all mom's fault. The child falls. Not only all children fall, but children especially with these physical disabilities. What dad has tried to do is to soften the blow, literally, when there's a fall by having these elbow pads and using this preventative care. Not required by doctors, but certainly not discouraged. Mom doesn't agree. Briefly, just in response, counsel has suggested that there was an attempt by force majeure in this verified petition for order of protection. I think the documentation is very clear. Dad doesn't say, don't let mom have care of the child, don't let mom have the child at all. Dad is saying, hey, we've been shared parenting, that shared parenting should stick. And that's what he asks for in the verified petition for order of protection. No sort of force majeure or any sort of suggestion like that. He just wants Shea, mom, to not do these, not physically assault him in front of the child. That's what he's asking. The fact that mom has and continued to call him in front of the child, a deadbeat, a loser, pathetic, jerk, sorry excuse for a parent, all in front of Harper, and that's transcript of August 8, 2014, page 101, and refer to the partner, Natalie, who Harper has a very close relationship as a pathetic woman, was not part of the petition for order of protection, but simply a demonstration of how Shea reacts to and treats the father in front of the child. The fact that mom would complain to and ask the school to restrict dad from having information, leaving not only dad's name out, but saying in communications, hey, I'm the guardian of the child. Well, she'd never been appointed guardian, but she just took it upon herself. She's the one that controls. No one else gets to say anything, and certainly not dad, who she won't even let the school know in any documentation is dad. She's, and continued to tell other people, including the child's caregivers at the school, that Robbie was an abuser, and that was in text messages that were admitted in part of the appendix and in the transcript of November 12, 2014, at page 89. The court had previously asked about the limited guardian ad litem. The court should not have given any weight to the limited guardian ad litem hearsay, and that should have just not been regarded at all. That's what we would ask, ask for reversal and a grant of custody to the petitioner. Thank you. Thank you, Ms. Wyman. Thank you, Mr. Olmstead. The case is submitted, and the court will stand in recess.